IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal No.  08-374-12 |
| | ) | 08-374-13 |
| JEROME LAMONT KELLY, | ) | |
| ALONZO LAMAR JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

### I.  Introduction

Pending before the court are two motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) submitted by defendants Jerome Lamont Kelly ("Kelly" or "JK") and Alonzo Lamar Johnson ("Johnson" or "AJ"). (ECF Nos. 894, 902.) On August 21, 2009, a superseding indictment was filed at criminal action number 08-374 charging Kelly, Johnson, Eric Alford[1] ("Alford" or "EA"), Stephen Bynum ("Bynum"), Anthony Hoots ("Hoots" or "AH"), and ten others with conspiracy to distribute and possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine and fifty grams or more of a mixture containing a detectable amount of cocaine base from in and around 2007 until in and around October 2008. (ECF No. 205.) The conspiracy charged in the superseding indictment is referred to as the "Alford conspiracy." (See ECF Nos. 893 at 9, 902 at 3.)

---

[1] Alford and Bynum were also charged in the superseding indictment with attempt to possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine on or about June 11, 2008. (ECF No. 205.)

In April 2012, the charges against Kelly and Johnson with respect to the Alford conspiracy were tried before a jury.[2] At the close of the all the evidence, counsel for Kelly and Johnson each moved orally for judgment of acquittal under Federal Rule of Criminal Procedure 29(a), alleging that the government did not prove beyond a reasonable doubt that Kelly and Johnson were members of the Alford conspiracy. (H.T. 4/16/12 (ECF No. 851) at 38-39.) The court reserved decision on the motion pursuant to Federal Rule of Criminal Procedure 29(b)[3] and submitted the case to the jury. (Id. at 39.) On April 17, 2012, Kelly and Johnson were convicted by a jury of conspiracy to distribute and possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine and fifty grams or more of a mixture containing a detectable amount of cocaine base from in and around 2007 until in and around October 2008. (H.T. 4/17/12 (ECF No. 852) at 2-3.)

On September 18, 2012, Kelly filed a first motion for acquittal. (ECF No. 886.) On September 25, 2012, the court ordered Kelly to amend the first motion for acquittal to set forth the grounds upon which the motion was based. On October 1, 2012, Kelly filed a brief in support of the first motion for acquittal. (ECF No. 893.) On October 2, 2012, Kelly filed an amended motion for acquittal. (ECF No. 894.) On October 16, 2012, the government filed a response to Kelly's motion for acquittal. (ECF No. 901.) On October 22, 2012, Johnson filed a memorandum

---

[2] On November 18, 2009, Bynum pleaded guilty to counts one and two of the superseding indictment. (ECF No. 335.) On December 17, 2009, Hoots pleaded guilty to count one of the superseding indictment. (ECF No. 360.) On April 19, 2011, Alford pleaded guilty to counts one and two of the superseding indictment. (ECF No. 583.)

[3] Federal Rule of Criminal Procedure 29(b) provides:

> **(b) Reserving Decision.** The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

FED. R. CRIM. P. 29.

of law in support of a judgment of acquittal. (ECF No. 902.) On October 26, 2012, the government filed a response to Johnson's memorandum of law. (ECF No. 904.) On November 1, 2012, the court held a hearing on Kelly's and Johnson's motions for judgment of acquittal and took the matter under advisement for the opinion of the court to be filed at a later date. After considering the submissions of the parties and the oral argument heard on November 1, 2012, the court will deny Kelly's and Johnson's motions for judgment of acquittal because the government introduced evidence sufficient for a reasonable jury to find them guilty as charged in the superseding indictment.

## II.    Evidence presented in the government's case-in-chief

### A. The Alford Conspiracy[4]

Alford supplied cocaine for the Alford conspiracy from a source in Houston, Texas known as "Rob." (T.T. 4/10/12 at 75, 82.) Bynum acted as the courier for the Alford conspiracy by driving to Houston, Texas on more than fifteen occasions to purchase large quantities of cocaine from Rob for $20,000 per kilogram. (T.T. 4/10/12 at 75-82.) Hoots testified that he purchased cocaine to sell to others "mainly" from Alford. (T.T. 4/9/12 at 119.) Hoots testified that "[Alford] would sell [cocaine] to me, but a lot of times we'd put our money in together and try to get the best possible deal we could get." (Id.) Hoots testified that there were several occasions during 2007 and 2008 where Alford did not have cocaine to supply to Hoots. (T.T. 4/5/12 at 137-38.) Under those circumstances, Hoots purchased cocaine from other suppliers. (Id. at 163.) On two different occasions in 2007-2008, Hoots purchased nine ounces of cocaine from Kelly. (Id.)

---

[4] Kelly and Johnson do not dispute that the government presented sufficient evidence for the jury to find the existence of the Alford conspiracy beyond a reasonable doubt. The court, therefore, focuses its discussion of the evidence presented at Kelly and Johnson's trial on the evidence adduced to prove beyond a reasonable doubt that Kelly and Johnson were co-conspirators in the Alford conspiracy.

**B. Kelly**

Government agents learned via a wiretap on Hoots' phone that Alford planned to receive a large shipment of cocaine in early-to-mid-June 2008. (T.T. 4/9/12 at 75.) On June 5, 2008, the following telephone conversation took place between Alford and Kelly:

EA: Yo

JK: What's up with you, boy?

EA: What's goin on with you, fam?

JK: Awe, just chillin.

EA: Oh, yeah?

JK: Yeah. Shit, what's good?

EA: UI[5]. Uh it should be cool, uh, what's today, today Thursday?

JK: Yeah.

EA: Let me see…see Thursday…UI should be cool by Monday.

JK: Aite.

EA: A Aite?

(T.T. 4/9/12 at 41; ECF No. 901-1.)[6] Less than one week later, on June 11, 2008, officers with the City of Columbus, Ohio, Police Department (the "Columbus police") conducted a traffic stop

---

[5] "UI" stands for unintelligible portion of the recording of the wire tapped telephone conversation. (T.T. 4/9/12 at 68; ECF NO 901-1.)

[6] Michael C. Warfield ("Warfield"), a Pennsylvania State Police trooper, testified that persons involved in drug trafficking use innocuous terminology and "try to do things to avoid being detected by law enforcement." (T.T. 4/11/12 at 138.) He also testified with respect to the purpose of selling drugs:

> People sell -- in the drug business, people sell illegal narcotics to make money. That's the bottom line. I've never known or -- since I've been involved, since '97 or '99 -- people that sell drugs for fun, this is something that they enjoy. The purpose of selling drugs is to make money, and you have to protect that money.

(Id. at 136.)

on Bynum's vehicle. (T.T. 4/10/12 at 91.) The Columbus police recovered a total of eight kilograms of cocaine from Bynum's vehicle. (Id.)

On June 24, 2008, the following telephone conversation, in pertinent part, took place between Kelly and Alford:

EA: Yeah. Yeah, I think so. Shit, I done came fishin, man.

JK: Oh, yeah, where you go to?

EA: UI fishin. I gotta do something to utilize my time.

JK: Yeah.

EA: Hell yeah. UI. So he probably should be hittin me up today. At least to tell me something.

JK: Yeah.

EA: As soon as I hear from him I'll just call you back and give you, you know what I mean, some type of closure.

JK: Aite, boy.

(T.T. 4/9/12 at 42; ECF No. 901-2.) Two days later, on June 26, 2008, Alford telephoned Adolph Campbell ("Campbell" or "AC"), one of his drug suppliers, and the following conversation took place:

EA: Hey, um, uh, uh, we ain't we ain't gonna be good this weekend, huh?

AC: All I all I'm doing is waitin like everybody else. UI.

EA: So you think I should you think I should go on this vacation or not?

AC: Motha fucker, that wouldn't stop UI me from goin on no vacation.

EA: Huh?

AC: It wouldn't stop me from goin on no vacation.

EA: But I don't wanna miss out.

AC: Hey, man, I  I don't know what to tell you then, because…

EA: What you say?

AC: UI or tomorrow.

EA: Huh?

AC: Um, I said, um if if, uh, it come through I'm just gonna have to hold you some.

EA: Yeah.

AC: If it don't then, you know, they keep sayin, you know, I been waitin since I've been out. Put it like that.

EA: Yeah

AC: UI that's how it always is. I don't know until til it happens.

EA: Uh huh.

AC: Even when they was, uh, twenty, I UI the same way, man. I don't know when they getting here.

EA: Yeah.

AC: I like it like that.

EA: Uh huh. So you gonna you gonna you gonna hold me like wanna hold me at least about about a dime, then?

AC: Yeah, I can hold you about a dime.

EA: Oh, ok.

AC: As long as you gonna as you gonna give me my number.

EA: Huh:

AC: Long as you gonna give me my number.

EA: What's that?

AC: Twenty-six.

> EA: For real?

> AC: Yeah.

(T.T. 4/9/12 at 45; ECF No. 901-3.) Daniel Booker, a special agent with the Federal Bureau of Investigations ("FBI"), testified during Kelly and Johnson's criminal trial and provided the following interpretation of the June 26, 2008 telephone call between Alford and Campbell:

> Eric Alford is calling his supplier, Adolph Campbell, and -- to see if he has cocaine -- a supply of cocaine in. And Adolph Campbell says: No, I'm waiting just like everybody else. So Eric Alford is thinking about going on vacation, but he doesn't want to go on vacation because he doesn't want the cocaine to come in while he's gone, that he might miss out, as he puts it. So he talks to Campbell about holding some for him until he gets back from his vacation. And then they discuss price. Campbell says: ["]I'll hold some for you as long as you can give me the price that I want," and they say the price is 26. That's $26,000 per kilogram.

(T.T. 4/9/12 at 45.) Four days later on June 30, 2008 at 7:13 p.m., Alford called Campbell and the following telephone conversation took place:

> EA: Hey, um, hey my man wanted like a a four piece.

> AC: No, man, I ain't dealin with nobody but you.

> EA: Naw, UI I'm sayin I ain't it ain't no dealin with him. I'm saying he want four. How we gonna do it?

> AC: Mother fucker you better bring UI I just told you to bring. That's what you better do. I don't want to hear nothin about nobody else, boss. That's that's how I'm rollin.

> EA: Yeah, I already know that. I'm I'm just saying you you you wanna, uh, you wanna meet me at my spot so I could just, uh, I could just see him real quick just give you just give you the change. You ain't got to see him.

> AC: Well, man, if he don't trust you with the with with the paper then fuck him.

> EA: Yeah.

> AC: So I definitely don't want to see him. He UI he don't trust you I wouldn't even fuck with him.

EA: Yeah, UI trust me I just ain't even, you know what I'm saying? He probably just used to me just bringing him the shit.

AC: He probably some motha fucka I already know.

EA: Naw, naw, you don't know him.

AC: Yeah, aite.

EA: This motha fucka I been this a mother fucka like last time and shit you, uh, you came over the crib and met over Swiss and shit. He grabbed up a little a little decent little bit.

AC: Well how many you…

EA: Same same nigga and shit.

AC: How many you want?

EA: I'ma grab, um, I'ma grab one and shit. Told you my change is a litte ugly. That's why I was, you know what I mean? That's why I said I needed a little help, man.

AC: Look here, yeah, I need help, too. Shit.

EA: Yeah, I I know, I know. I ain't, you know.

AC: UI. I'll see you over there. I'm on I'm on my way over the port and then I'll I'll I guess I'll call you when I'm on my way, but he should be already be there or whatever, I don't know. I ain't waitin around and then shit better be, that paper better be right.

(T.T. 4/9/12 at 46; ECF No. 901-4.) Booker testified that during the June 30, 2008 telephone call between Alford and Campbell, Alford was inquiring about obtaining four kilos of cocaine for a third person. (T.T. 4/9/12 at 47.) Booker explained that Campbell indicated that he did not want to meet the third person, and that Alford's statement that the third person was "probably just used to me just bringing him the shit" meant "there's an established trust between Alford and his customer; that probably they've done this numerous occasions, and there is -- there is a level of trust between the two." (T.T. 4/9/12 at 49-50.) Booker testified that Alford's statement that "This

motha fucka I been this a mother fucka like last time and shit you, uh, you came over the crib and met over Swiss and shit. He grabbed up a little a little decent little bit" meant that Campbell and Alford performed this type of transaction with the third person before. (T.T. 4/9/12 at 50.)

Three minutes after placing the telephone call to Campbell on June 30, 2008, Alford called Kelly and the following conversation took place:

JK: Yo.

EA: Yo.

JK: Yeah, what up, cous?

EA: What did, um, he, uh, he said he gonna meet us over at my spot. You ready now?

JK: Yeah, in about about fifteen minutes.

EA: Alright, I'ma, um, what you just gonna meet me up there or you want me to come grab you?

JK: Shit, you could come…it don't…either or it don't matter, cous.

EA: Aite, cause I'ma be rollin through the hood anyway. I'm comin from Monroeville.

JK: UI. You wanna grab me then?

EA: Yeah, I'll come grab you.

JK: Aite.

EA: Aite.

(T.T. 4/9/12 at 52; ECF No. 901-5.) During questioning by the government, Booker testified as follows with respect to Alford's telephone call to Kelly on June 30, 2008:

Q Just a few more questions about this particular call. Does this give you any indication who the person was that was going to be purchasing the four pack?

A Yes. The indication is that the first person that Eric Alford called after speaking with Adolph Campbell about the cocaine is Jerome Kelly.

Q And in that previous call they were referencing that they were going to get together and get the paper right before he met with his supplier, correct?

A That's correct.

Q And what is happening between Jerome Kelly and Eric Alford? And you told us it was specifically Eric Alford who then called Jerome Kelly for this call, correct?

A That's correct.

Q Please continue with what was going on here.

A So after speaking with Adolph Campbell, Eric Alford called Jerome Kelly and told Kelly that he, meaning Adolph Campbell, is going to "meet us over at my spot," Eric Alford's spot.

Q Do they have to describe exactly where his spot is, meaning Eric Alford's spot is, during the course of this conversation?

A No. Again, there seems to be mutual understanding. They both know where that spot is.

Q What happens from there?

A So they agree that Eric Alford is going to pick up Jerome Kelly and they're going to proceed to his spot, Eric Alford's spot, to meet with Adolph Campbell.

Q Does Eric Alford have to question Jerome Kelly on where it is that he's going to meet him to pick him up?

A No.

Q Do they indicate where he's going to be going after that or where he's going to be coming from?

A Eric Alford is coming from Monroeville, and he has to -- he says: I'm gonna be rolling through the hood anyway. So the "hood" is -- again, they both understand what the "hood" is.

Q But they specifically label and list the City of Monroeville, correct?

A That's correct.

(T.T. 4/9/12 at 52-54.) One minute after placing the telephone call to Kelly on June 30, 2008,

Alford called Hoots, and they had the following conversation:

> AH: Yo

> EA: Yo

> AH: What's up?

> EA: Deuce eight

> AH: What?

> EA: Deuce eight

> AH: Huh?

> EA: I said a deuce eight.

(T.T. 4/9/12 at 55; ECF No. 901-6.) Shortly after calling Hoots, Alford called Javaughn Jones

("Jones" or "JJ"). (T.T 4/9/12 at 59; ECF No. 901-7.) Alford told Jones "Yeah, old head just

called me and shit, told me 30 and shit, I'm on my way to see him now." (Id.) Alford explained

to Jones how the purchase from Campbell was going to occur:

> I tried already, I got, I got this one, my one man this nigger want four he wouldn't
> even, he wouldn't even let me get the mother fucking the four so I could go see
> my man, I got to, I got to tell this nigger to come over to the crib, you know what
> I mean, count his change and then dude going to come to my spot and shit man,
> this is how funny this nigger is acting towards me man….

(Id.)[7]

Robert Veinovich ("Veinovich"), a sergeant detective in the Borough of West Mifflin

Police Department assigned to the Drug Enforcement Administration, testified that on June 30,

---

[7] Hoots testified that a seller's relationship with his buyer affects the price he will charge the buyer for the drugs. (T.T. 4/5/12 at 133.) He explained:
> Um, if you really don't know him, you might charge him more because you don't
> know if they're going to come back and keep doing business with you. But if you
> got a family relationship with them, then -- a steady customer for you, you'll
> probably start cutting the price down for them.

(Id.)

2008, he was instructed by the FBI to find Alford because "there was a drug deal going to happen with Eric Alford and the source." (T.T. 4/11/12 at 49-50, 76.) Veinovich located Alford and noticed "that Alford was alone and that he was driving the black Suburban." (T.T. 4/11/12 at 81.) Veinovich notified his fellow officers "to be on the lookout, [because Kelly] might be heading over towards Swissvale." Veinovich identified 2320 Manor Avenue as Alford's "stash house." (T.T. 4/11/12 at 81-82.)

Shane Countryman ("Countryman"), a detective with the Allegheny County sheriff's office assigned to the FBI Safe Streets Task Force, testified that on June 30, 2008, he "received instructions from Detective Mullen that he had intercepted a call over the wiretap that Eric Alford had arranged to meet with an unknown male at his residence -- at Eric Alford's residence in Swissvale." (T.T. 4/11/12 at 2-3, 12.) Countryman testified that in response to that information, he and two other detectives set up surveillance on "2320 Manor Street, which was Eric Alford's -- one of Eric Alford's residences that we had known him to use to receive drugs when he purchased cocaine. So we had set up surveillance on that house." (Id. at 13.) Countryman testified that the purpose of the surveillance on 2320 Manor Street

> was to see Mr. Alford and the unknown male at that point -- he was picking up an unknown male who he had indicated was -- to his supplier via telephone that was intercepted, this person wanted to purchase four kilograms of cocaine. Mr. Alford was going to purchase one kilogram of cocaine for himself. So at this point we wanted to identify the person, unknown person, that was purchasing the four kilograms through Mr. Alford, as well as the supplier that was going to bring the five kilograms.

(T.T. 4/11/12 at 13.) Countryman testified as follows with respect to his observations on June 30, 2008 of Alford, the "unknown male," i.e., Kelly, and the "supplier," i.e., Campbell:

> We had set up and we had received another call from Detective Mullen who had indicated that there was an incoming call from the supplier to Alford, who indicated that he was right behind him. At that point we had seen the black Suburban that we had already known through our investigation was Eric Alford

pulling up Manor, driving up the hill of Manor, drove beyond us to the intersection, turned around, drove back down, parked directly in front of his house on the left-hand side.

At the same point, maybe 30 seconds later, we saw a gray colored or a light blue colored Toyota Camry pulling up the street, did the same maneuver, drove beyond us, turned around, drove down, parked directly behind Mr. Alford's black Suburban.

…

As the black Suburban -- Mr. Alford's black Suburban pulled up, I observed Mr. Alford get out of the driver's side of his vehicle, and I observed a male get out of the passenger side. Again, as I stated, at this point we did not know who that male was. But as the male got out of the vehicle, turned and faced us to walk behind the Suburban, I was able to positively identify that male at that point.

…

[The unknown male] came behind the vehicle, walked over to Mr. Alford, and they walked into Mr. Alford's residence. You had to go up some steps to get to 2320.

…

And then I also observed the other male, who remained unidentified -- I could not -- I could not say who that was at that point. He was later identified, but at that point I still, just by looking at him, could not identify him.

He got out of the driver's side of his vehicle, went to the trunk of his vehicle, removed a -- like duffle style gym bag, closed the trunk, and walked into 2320 Manor.

(T.T. 4/1/12 at 16-18.) When asked by counsel for the government who the "unknown male" was that exited the passenger side of Alford's vehicle, Countryman responded "The Defendant, Jerome Kelly" and identified Kelly as he sat in the courtroom on April 11, 2012. (Id. at 17.) Countryman testified that Campbell was the "other male" he observed at the stash house on June 30, 2008. (Id. at 18.) Countryman described what he saw after Alford, Kelly, and Campbell entered the stash house:

Some time went by, ten to fifteen minutes, I believe, went by, and the three males exited 2320 Manor and went to their respective vehicles and left. Mr. Campbell had gone back to the trunk of his vehicle with the same bag that he had entered with, placed it in the trunk, got into his vehicle and left. Mr. Alford and the Defendant had walked out.

Mr. Alford at this point was carrying a bag that I don't believe he carried in. I didn't see him carry a bag in, but he carried a bag out, placed it in the back door of the Suburban, closed the door. The Defendant got into -- Mr. Kelly got into the passenger side of the vehicle, and they left.

(T.T. 4/11/13 at 19.)

On June 30, 2008 at 9:16 p.m., Alford called Hoots and informed him about what happened with Kelly and Campbell at the stash house. (T.T. 4/5/12 at 144; ECF No. 901-9.) Hoots asked Alford whether "[got] him one." (Id.) Alford responded "Man, nigga ain't even had what I wanted, man….This nigga had four, man." (Id.) Alford explained:

Man, listen I told him I told him five I told I told him I wanted five. I told him I wanted one for me, and then I started calling I start y'all. I called motha fuck'n Rome, he said that motha fuckin he was n his way up, you know what I'm saying, but Rome was with me. I couldn't even ta, you now what I mean, talk to you and tell you who I was with and shit. That nigga wanted four, you now what I'm sayin?

(Id.) The next day on July 1, 2008, Alford telephoned Kelly. Their conversation, in pertinent part, was as follows:

EA: What's good with you?

JK: Awe, shit, you, uh, you, uh, whip yours?

EA: Yeah yeah.

JK: Truth, that thing lock up on you quick?

EA: Naw, I mean, I did jar anyway.

…

JK: Truth, I was trying to the weight up and everything, man, it just kept doing it, too. I said fuck it.

EA: Yeah, you don't know how to lock it in with without without mixin it?

JK: No, I ain't never tried like that.

EA: What you what you be putting on it?

JK: Shit, like seven, seven I put sev like eighty this time.

…

EA: Put like a buck on it, then when you motha fuckin, um, when you uh, hit it when you hit it with the ice and get it out of there it should already lock it in. At least UI should be on it.

…

EA: Yeah, what you got like five and a half?

JK: Not like I should have. Huh?

EA: What you just got a extra single or something?

JK: Yeah.

(T.T. 4/9/12 at 67-68; ECF No. 901-10.) On April 9, 2012, Booker testified that in the July 1, 2008 telephone conversation, Alford and Kelly were "talking about the cocaine, cooking the cocaine that they purchased the day before." (T.T. 4/9/12 at 68.) Booker explained:

> They're putting some other powdered substance in with the powdered cocaine to increase the volume of the product that they end up with. "Cutting agent" could be baking soda, it could be anything. They come up with all sorts of things to put in there. But the purpose of it is to -- not to -- well, it dilutes the potency of the cocaine, but the purpose of putting it in there is to increase the volume of what they end up with so they can sell more.

(T.T. 4/9/13 at 70.)

**C. Johnson**

In 2007 through 2008, Hoots purchased cocaine "mainly" from Alford. (T.T. 4/9/12 at 119.) During that time, Hoots was purchasing anywhere from one-half to two kilos per week. (Id.

at 118, 129.) Hoots sold cocaine to various individuals, including Johnson. (<u>Id.</u> at 139, 147-48.)

Hoots testified that during 2007-2008, "[Johnson] was a pretty regular of mine. He was a pretty

regular, probably came out once a week," and that he would commonly purchase four and one

half ounces of cocaine from him. (<u>Id.</u> at 139.) Hoots testified that he gave Johnson cocaine on

credit, explaining that "if [Johnson] didn't have all the money, [he] would still give him the four

and a half ounces and [Johnson] might have just owed [him for it]." (T.T. 4/9/12 at 139.)

During Kelly and Johnson's criminal trial, the government played recordings for the jury

of telephone conversations between Hoots and Johnson obtained during the government's

wiretap investigation. The contents of the telephone conversation played for the jury, which

occurred on May 6, 2008, are as follows:

AJ: What up fam?

AH: What up?

AJ: Hey, this my new joint.

AH: Aight, aight.

AJ: Hey uh, my people's was uh, inquiring about a cidnode.

AH: Who?

AJ: My, my fam.

AH: Who?

AJ: My, my people's, Howe.

AH: Oh, yeah.

AJ: Yeah, he wanted a code but I was like, man, you know I don't even wanna be
doin to that. Cause he wanted to, you know, chizneese you know I mean.

AH: Yeah. Talking bout your, your namesake?

AJ: Yeah.

AH: Yeah. Aight, I'll fuck with him. It's all good. But I ain't even uh, you know I mean. I, I got, I'm, I'm waitin for that boat to come in man.

AJ: Oh okay.

AH: You know I mean.

AJ: Yeah, yeah, yeah, yeah.

AH: But uh, I hit you up and let you know. But you know what I mean, you tell him, tell him when I'm on I don't mind fuckin with him all day.

AJ: Aight, okay, good look.

AH: Aight, aight.

(T.T. 4/5/12 at 145; ECF No. 904-1.) Hoots testified that "This is my new joint" meant Johnson was calling Hoots from his new telephone number. (T.T. 4/5/12 at 146.) Hoots testified that a "cidnode" was Johnson's twist on an "area code" or four-and-one-half ounces of cocaine.[8] (Id.) Hoots explained that "Howe" was Johnson's cousin "Howie Morrison" and that Johnson was asking Hoots whether he would sell Howe four-and-one-half ounces of cocaine. (Id. at 147.) Hoots testified that his response to Johnson, "Aight, I'll fuck with him," meant that Hoots agreed to sell cocaine to Howe. (Id. at 147-48.) Hoots explained that when he said he was "waiting for his boat to come in" he meant that he was waiting "for [his] supplier to give [him] something" and "even though [he] said [he would] do business with [Howe], [he] didn't have it on [him] at that time to do the transaction." (T.T. 4/5/12 at 148.)

The next day, May 7, 2008, the following telephone conversation took place:

AH: Hello.

AJ: What up daddy?

AH: What up?

---

[8] Hoots testified that "412" is the area code for the Pittsburgh, Pennsylvania area. (T.T. 4/5/12 at 123-24.)

AJ: Shit.

AH: Yep. Probably not til Friday.

AJ: Oh Friday ok okay alright. Well I'll just try you back the big cuz.

AH: Alright pimp.

AJ: My man.

(T.T. 4/9/12 at 19; ECF No. 904-2.) Booker testified that the telephone call on May 7, 2008 between Johnson and Hoots was "a follow-up call from the previous day, when Alonzo Johnson had requested drugs from Anthony Hoots. So he called him on this day to follow up. And Hoots tells him probably he's not going to have the drugs until Friday." (T.T. 4/9/12 at 20.)

On May 9, 2008, Johnson called Hoots on the telephone, and the following conversation took place:

AJ: Are we groovy?

AH: Nope.

AJ: Not yet?

AH: No.

AJ: Aright. Just hit me up then cuz.

AH: Alright. You know I got you.

(T.T. 4/9/12 at 21; ECF No. 904-3.) Booker testified that in the telephone conversation on May 9, 2008, "Johnson is asking Hoots if he has received his -- his shipment yet or his supply [of cocaine]" and when Hoots responds in the negative, "Johnson is saying just call me when you get it. And Hoots says: 'All right, you know I got you.' Kind of saying don't worry, I'll for sure call you when I get it." (T.T. 4/9/12 at 21-22.)

On May 11, 2008, Johnson called Hoots on the telephone, and the following conversation took place:

AJ: Hey you feel like fuckin with me for a stack…on the code?

AH: You owe me a stack?

AJ: Could I?

AH: Yeah its all good.

(T.T. 4/5/12 at 148; T.T. 4/9/12 at 22; ECF No. 904-4.) Hoots and Booker both testified that in this conversation, Johnson asked Hoots to give him four and one-half ounces of cocaine for Johnson to pay one thousand dollars for at a later date. (T.T. 4/5/12 at 149; T.T. 4/9/12 at 23.)

The following day, May 12, 2008, Johnson called Hoots on the telephone and told him "I got you in the water right now cuz." (T.T. 4/5/12 at 149; T.T. 4/9/12 at 24; ECF No. 904-5.) Hoots and Booker testified that Hoots' statement meant that Hoots was in the process of cooking powered cocaine into crack for Johnson. (T.T. 4/5/12 at 150; T.T. 4/9/12 at 25.)

Later that same the day, Hoots called Johnson on the telephone and told him: "I'm on my way cuz." (T.T. 4/9/12 at 26; ECF No. 904-6.) Johnson responded: "Alright I'm out here." (Id.) The next telephone conversation between hoots and Johnson that was played for the jury occurred on May 13, 2008. (T.T. 4/9/12 at 28; ECF No. 904-8.) In that conversation, Hoots told Johnson that he "was gonna make [his] way toward [Johnson]." (Id.) One hour and eleven minutes later, Hoots called Johnson and Johnson asked Hoots "You red, you out there?" (T.T. 4/9/12 at 30; ECF No. 904-9.) Hoots responded: "Yeah, I'm comin across the bridge now, fam." (Id.)

Eight days later on May 21, 2008, Johnson and Hoots had the following telephone conversation:

> AJ: What's good?
>
> AH: Can't call it, hey may whatchama call it, I had dudes whatchama call it but my man got em and shit and I, I, I ain't know if he was gonna let me you know what I mean?
>
> AJ: Yeah.
>
> AH: UI for me cause my boat ain't gonna be there till Friday.
>
> AJ: I'll wait on you then fam UI I'll wait on you then fam cause that way I'll probably be having it official.
>
> AH: Alright then.

(T.T. 4/9/12 at 31; ECF No. 904-10.) Booker offered the following explanation of this telephone conversation:

> Well, what -- "what's good," they're talking about cocaine and like are you ready, can you do it, can you do it again, can you help me out again? And Hoots is basically saying that he has some sources to get it -- to get it from, but he's not real comfortable with it.

(T.T. 4/9/12 at 31-32.) The government's questioning with respect to Booker's interpretation of this telephone call occurred as follows:

> Q So what happens there, when Mr. Hoots says: "Cause my boat ain't gonna be there 'til Friday"?
>
> A His -- he's not going to receive his supply until Friday.
>
> Q Supply of what?
>
> A Cocaine.
>
> Q What happens as a result of learning that the cocaine isn't going to be in until Friday, what does Alonzo Johnson indicate?
>
> A He says that he'll just wait until Hoots gets his supply of cocaine.
>
> Q Does he say why he's not going to go to someone else?
>
> A He says: "That way I'll probably be having it official."

Q Now, what does that mean between these two and from your understanding of the other calls in this investigation?

A Um, "official" means -- it's a reference to their established relationship. He's comfortable getting it from Hoots. He thinks it's safer to get it from Hoots, and probably the price will be better because he and Hoots have an established relationship and they've already worked out price.

(T.T. 4/9/12 at 32.)

## III. Standard of Review

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) shall be granted if the evidence presented by the government at trial is insufficient to sustain a conviction of the offense. FED R. CRIM. P. 29(a). A court's first inquiry must be whether the jury's guilty verdict was supported by substantial evidence. United States v. Wexler, 838 F.2d 88, 90 (3d Cir. 1998). "[A] finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).

A defendant has a very heavy burden to show insufficiency of the evidence. United States v. Gonzales, 918 F.2d 1129, 1132 (3d Cir. 1990). It is well established that when ruling on a post-conviction challenge to the sufficiency of evidence, a court must view all evidence in the light most favorable to the government. Id. If a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt based upon the available evidence, the court must sustain the jury's verdict. United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998).

A court must "'draw all reasonable inferences in favor of the jury's verdict.'" Smith, 294 F.3d at 476 (quoting United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996)). "Courts must be ever vigilant in the context of [Federal Rule of Criminal Procedure 29] not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting

its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (assessing credibility of witnesses, assigning weight to the evidence, and drawing inferences of fact from the evidence are functions of the jury). The court must decide the motion based solely on the evidence presented during the government's case-in-chief. FED. R. CRIM. P. 29(b).

## IV.  Discussion

### A.  Conspiracy

To prove a conspiracy, the government must proffer sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that the alleged conspirators had (1) "a unity of purpose," (2) "an intent to achieve a common goal," and (3) "an agreement to work together toward that goal." United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999) (citing United States v. Robinson, 167 F.3d 824, 829 (3d Cir.1999)). "The government may prove these elements entirely by circumstantial evidence." Gibbs, 190 F.3d at 197. "The existence of a conspiracy 'can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding.'" Id. (quoting United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986)). "The government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants." Gibbs, 190 F.3d at 197 (citing United States v. Theodoropoulos, 866 F.2d 587, 593 (3d Cir.1989)).

"It is well-settled that a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." Gibbs, 190 F.3d at 198.  The Third Circuit Court of Appeals has held that "if the only agreement is for the seller to sell and the buyer to buy

22

an amount of cocaine, no conspiracy exists." Id.  If the buyer has knowledge that he or she was part of a larger operation, however, he or she may be shown to be a member of the conspiracy. Id. The court in Gibbs explained:

> Often that knowledge is evidenced by the defendant's agreement to process cocaine into crack, or collect or launder drug proceeds….In cases where the defendant's only involvement in the conspiracy appears to be drug purchases, courts have looked to the surrounding circumstances to determine whether the defendant is a mere buyer who had such limited dealings with the conspiracy that he cannot be held to be a conspirator, or whether he has knowledge of the conspiracy to the extent that his drug purchases are circumstantial evidence of his intent to join that conspiracy.

Gibbs, 190 F.3d at 198-99. In Gibbs, the court set forth factors the court should consider to determine whether the alleged co-conspirator "has knowledge of the conspiracy to the extent that his drug purchases are circumstantial evidence of his intent to join that conspiracy." Id. The court is to consider: "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and whether there is a demonstrated level of mutual trust." Id. at 199. The court may also consider "the size of the transaction, whether the defendants have 'put their heads together' to figure out planning, organization, and ways to conceal their activities, and whether purchases and sales among the defendants are made on credit." United States v. Salehi, 187 Fed. App'x 157, 171 (3d Cir. 2006) (citing Gibbs, 190 F.3d at 199). In Gibbs, the court noted:

> While these factors are not necessarily dispositive of the issue, their presence suggests that a defendant has full knowledge of, if not a stake in, a conspiracy: when a defendant drug buyer has repeated, familiar dealings with members of a conspiracy, that buyer probably comprehends fully the nature of the group with whom he is dealing, is more likely to depend heavily on the conspiracy as the sole source of his drugs, and is more likely to perform drug-related acts for conspiracy members in an effort to maintain his connection to them.

Gibbs, 190 F.3d at 199. "Not all of the above factors must be present in order to find a conspiracy-indeed, the presence of even one factor may be sufficient." United States v. Nguyen, 344 Fed. App'x 821, 824 (3d Cir. 2009).

**B.     Kelly**

Kelly concedes that the government proved beyond a reasonable doubt that the Alford conspiracy existed, cocaine and crack cocaine are controlled substances, and that the purpose of the Alford conspiracy was to unlawfully possess and distribute cocaine and crack cocaine. (ECF No. 893 at 9-10.) Kelly argues that the government failed to prove beyond a reasonable doubt that (1) he joined the Alford conspiracy and (2) he joined the Alford conspiracy knowing of its unlawful objectives. (Id. at 10.) Kelly argues the government failed to carry its burden in this regard for three reasons. The court will address each of Kelly's arguments in turn.

**(1) The jury did not properly follow the court's instructions**

Kelly argues the jury did not properly follow the court's instructions. (ECF No. 893 at 8.) Juries, however, "'are presumed to follow their instructions.'" United States v. Riley, 621 F.3d 312, 335 (3d Cir. 2010) (quoting Zafiro v. United States, 506 U.S. 534, 540-41 (1993)). Kelly does not argue that the court improperly instructed the jury. Kelly's argument with respect to the jury not following the court's instructions is that it could not have followed the court's instructions because it convicted him. As discussed infra, the court finds that based upon the evidence presented by the government, a rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. The court concludes, therefore, that Kelly's argument with respect to the jury not following the court's instructions has no merit.

**(2) Hoots' testimony lacks credibility**

Kelly argues the testimony of Hoots lacks credibility and should be viewed with "great suspicion" because he testified as an alleged co-conspirator "hoping to curry favor with the Government for a future benefit." (ECF No. 893 at 11.) It is not the function of the court in analyzing a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 "to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." Brodie, 403 F.3d at 133. The court declines, therefore, to assess the credibility of Hoots' testimony because in doing so, it would usurp the role of the jury charged with judging the credibility of the witnesses who testify before it. See id.

**(3) The evidence presented establishes nothing more than a buyer-seller relationship**

Kelly argues that even if the court believes Hoots' testimony, "such evidence establishes nothing more than a buyer/seller relationship." (ECF No. 893 at 12.) The court will consider the evidence presented by the government in light of the Gibbs factors to determine "whether [Kelly] [was] a mere buyer who had such limited dealings with the conspiracy that he cannot be held to be a conspirator, or whether he has knowledge of the conspiracy to the extent that his drug purchases are circumstantial evidence of his intent to join that conspiracy." Gibbs, 190 F.3d at 199.

**a. The extent to which transactions are standardized**

The government presented substantial evidence that Alford was talking about Kelly when he telephoned Campbell on June 30, 2008 to inquire about obtaining a "four piece" for "[his] man" and agreed to meet Campbell "at the spot." (T.T. 4/9/12 at 46; ECF No. 901-4.) The evidence shows that three minutes after telephoning Campbell and having that conversation, Alford called Kelly and told him "he said he gonna meet us over at my spot. You ready now?"

(T.T. 4/9/12 at 52; ECF No. 901-5.) Countryman testified that later that day, he saw Alford and Kelly together arrive and go inside Alford's stash house. Countryman testified that he saw Campbell arrive approximately thirty seconds later, exit his vehicle, and obtain a duffle bag from his trunk that he carried inside the stash house. Countryman testified that ten to fifteen minutes later, Alford exited the stash house carrying a bag that he did not have when he entered the house. Under those circumstances, the evidence presented by the government supports a finding beyond a reasonable doubt that Alford asked Campbell for four kilograms of cocaine on Kelly's behalf and that this was not the first time that Alford and Kelly engaged in such dealings together; indeed, the events leading up to the June 30, 2008 transaction with Campbell show that Alford and Kelly's dealings with respect to cocaine were standardized.

In the telephone conversations played for the jury, Alford did not tell Kelly or Campbell the location of "the spot" where they were going to meet on June 30, 2008. As Booker testified, however, they seemed to have a "mutual understanding" of where "the spot" was, as evidenced by Campbell arriving at Alford's stash house within thirty seconds of Alford and Kelly. Alford and Kelly's "mutual understanding" with respect to where they were going to meet Campbell supports a finding that June 30, 2008 was not the first time Alford and Kelly discussed the location of Alford's stash house and that they had a standardized procedure, i.e., going to the stash house, for the type of transaction that occurred that day.[9]

In the same telephone conversation that Alford told Campbell ""my man wanted like a a four piece," he told Campbell "[h]e probably just used to me just bringing him the shit." (T.T. 4/9/12 at 46; ECF No. 901-4.) Drawing all inferences in favor of the jury's verdict, Kelly would

_____

[9] The June 5, 2008 telephone conversation between Alford and Kelly also supports a finding that Alford was to provide drugs to Kelly on an occasion prior to June 30, 2008.

only be "used to" something if it occurred on more than one occasion.[10] Alford's statement to Campbell implies that Alford provided "the shit" to Kelly on previous occasions and that Alford and Kelly handled this type of transaction in a standardized way, i.e., Alford brought Kelly the cocaine.

As further evidence of their standardized procedures, in the telephone conversations that were played for the jury, Kelly and Alford talked in vague and conclusory terms yet neither of them appeared to be confused by what the other was saying. Their understanding of each other despite the vague and conclusory language supports a finding that they dealt with each other on prior occasions, their transactions were standardized, and that Kelly had knowledge of Alford's relationships with other people in the drug business. For example, on June 5, 2008, the following conversation took place:

> JK: Yeah. Shit, what's good?
>
> EA: UI. Uh it should be cool, uh, what's today, today Thursday?
>
> JK: Yeah.
>
> EA: Let me see…see Thursday…UI should be cool by Monday.
>
> JK: Aite.

(T.T. 4/9/12 at 41; ECF No. 901-1.) Alford does not explain *what* will "be cool by Monday," and Kelly does not question him yet responds in the affirmative saying "Aite." (Id.) Another example of their vague and conclusory conversations occurred on June 24, 2008:

> EA: Hell yeah. UI. So he probably should be hittin me up today. At least to tell me something.

---

[10] Later in the same conversation, Alford told Campbell "This motha fucka I been this a mother fucka like last time and shit you, uh, you came over the crib and met over Swiss and shit. He grabbed up a little a little decent little bit." (T.T. 4/9/12 at 46; ECF No. 901-4.) This statement supports a finding that Alford and Kelly participated in transactions with Campbell on a previous occasion.

JK: Yeah.

EA: As soon as I hear from him I'll just call you back and give you, you know what I mean, some type of closure.

JK: Aite, boy.

(T.T. 4/9/12 at 42; ECF No. 901-2.) In this conversation, Kelly did not ask who Alford was referring to or what the person was going to tell Alford, but again, responds in the affirmative by saying "Aite, boy." At no point did Kelly seem confused by who Alford was talking about. This conversation shows that Kelly was aware his dealings with Alford were a part of a larger operation, i.e., the Alford conspiracy. Alford and Kelly's vague and conclusory conversations continued on June 30, 2008:

JK: Yeah, what up, cous?

EA: What did, um, he, uh, he said he gonna met us over at my spot. You ready now?

JK: Yeah, in about about fifteen minutes.

EA: Alright, I'ma, um, what you just gonna meet me up there or you want me to come grab you?

(T.T. 4/9/12 at 52; ECF No. 901-5.) Again, Kelly does not inquire about who is going to meet him and Alford at "the spot." Drawing all inferences in favor of the jury's verdict, Kelly understood Alford's vague and conclusory statements because Kelly and Alford dealt each other on prior occasions, and Kelly knew his transactions with Alford depended upon Alford's relationships with third parties.

In <u>Salehi</u>, the court noted that "a jury may infer the existence of a drug conspiracy from unusual acts, such as cryptic telephone calls, alone." <u>Salehi</u>, 187 Fed. App'x at 171. In that case, the government introduced evidence of telephone conversations in which the alleged co-conspirators discussed a "plan" "all without identifying, or even alluding to, the subject matter of

their discussions or the item involved[,]" i.e., heroin. <u>Id.</u> at 167. The court found that "given the unusual and cryptic nature of those calls," a reasonable jury could infer the defendants were participants in a drug conspiracy. <u>Id.</u> The court noted: "Because it is atypical for people to engage in multiple discussions over a period of time in such manner, and because there was other evidence to support the inference, a reasonable jury was entitled to infer a conspiracy from the contact of these recorded calls themselves." <u>Id.</u> As discussed above, each of the telephone conversations between Alford and Kelly offered by the government lacked detail and specific information with respect to the people, places, and things they were talking about, but they both appeared to understand what each other was saying. As the court noted in <u>Salehi</u>, this type of cryptic conversation is unusual, and in light of the other circumstantial evidence presented by the government, it supports a finding that Kelly was a knowing participant in the Alford conspiracy to sell cocaine and crack cocaine for profit. <u>See</u> <u>Salehi</u>, 187 Fed. App'x at 167.

**b. Whether there is a demonstrated level of mutual trust**

The government presented substantial evidence that Alford and Kelly trusted each other. The evidence supports a finding that on June 26, 2008, Campbell told Alford that he would sell cocaine to Alford for twenty-six thousand dollars per kilogram. As discussed <u>supra</u>, Alford asked Campbell if he would sell four kilograms of cocaine to Kelly. Alford then picked up Kelly and took him to the stash house to meet Campbell. Assuming for the sake of argument that Alford told Kelly that Campbell's price was $26,000 per kilogram[11] – as opposed to an inflated price – Kelly would have brought $104,000 with him to the stash house in order to purchase four

---

[11]  Hoots testified that the lowest price for a kilogram of cocaine in 2007-2008 was $26,000. (T.T. 4/5/12 at 132.) He testified that the highest price for a kilogram of cocaine during this time period was $36,000. (<u>Id.</u>)

kilograms.[12] Based upon the evidence presented by the government, Kelly knew that Alford was aware that he had that much money on his person, yet he got into Alford's vehicle. Kelly's willingness to be around Alford with this large sum of money is substantial evidence of Kelly's trust of Alford.

Likewise, Alford's dealings with Hoots and Jones demonstrate that Alford trusted Kelly. Alford offered to purchase cocaine from Campbell for Hoots and Jones at an inflated price while he asked Campbell to sell cocaine directly to Kelly. Alford told Hoots that Campbell's price was $28,000 per kilogram, and he told Jones the price was $30,000 per kilogram. Drawing all inferences in favor of the jury's verdict, Alford intended to make a profit from Campbell's sales to Hoots and Jones by acting as the intermediary and pocketing any amount paid above Campbell's asking price. If Alford allowed Kelly to purchase directly from Campbell, however, he could not benefit from an inflated price for the transaction. Alford's willingness to connect Kelly directly to Campbell shows Alford's trust and close relationship to Kelly. Likewise, Kelly's willingness to carry $104,000 around Alford, who knew he was carrying that much money, demonstrates Kelly's trust of Alford.

Kelly and Alford's telephone conversation on July 1, 2008 is further evidence of their mutual trust of each other. Booker testified that in the telephone conversation on July 1, 2008, Kelly and Alford discussed adding a powdered substance to the cocaine in order to increase the volume of the product so they could sell more of it. Kelly asked Alford if he "whipped" his cocaine and if it "locked up" on him quickly. (T.T. 4/9/12 at 67-68; ECF No. 901-10.) Kelly told Alford that he was having trouble cooking his cocaine, and in return, Alford offered the following advice:

---

[12] Kelly having $104,000 in cash supports a finding that he was not merely a purchaser of cocaine, but was engaged in a larger cocaine conspiracy for profit.

Put like a buck on it, then when you motha fuckin, um, when you uh, hit it when you hit it with the ice and get it out of there it should already lock it in. At least UI should be on it.

(Id.) This conversation shows that Kelly intended on selling the cocaine that he purchased from Campbell and that he had knowledge that Alford intended to do the same thing. The reasonable inference in support of the jury's verdict is that if Kelly intended on selling the cocaine, his goals were the same as the Alford conspiracy's goals, i.e., to make a profit from selling cocaine. Second, it shows that Kelly and Alford trusted each other enough to share advice and talk openly about the cocaine in their possession and the processes they used to increase its volume. This tends to show that they had a stake in each other's success. Their use of a coded language, i.e., using words like "whipped" and "locked up," is further evidence of their familiarity with each other and the drug trade. Based upon the foregoing, the evidence presented by the government supports a finding that Alford and Kelly trusted each other in such a way as to provide circumstantial evidence of their unity of purpose to work together to sell cocaine and crack cocaine for profit.

### c. Whether the buyer's transactions involved large amounts of drugs

In Gibbs, the court described the significance of a defendant's involvement with a large drug transaction: "A large transaction or an accumulation of deals suggests more trust, garnered over a period of time, as well as a greater likelihood that the parties have 'put their heads together' to figure out planning, organization, and ways to conceal their activities." Gibbs, 190 F.3d at 200. The evidence presented at trial supports a finding beyond a reasonable doubt that Kelly's involvement in the Alford conspiracy involved him purchasing and selling a large amount of cocaine, i.e. five kilograms and eighteen ounces of cocaine. With respect to purchasing, Alford's telephone conversations with Kelly, Campbell, and Hoots on June 30, 2008

and Countryman's observations from the same day, support a finding that Alford and Kelly went to purchase five kilograms of cocaine from Campbell for at least $26,000 per kilogram, for a total of $130,000. Kelly's conversation with Alford with respect to increasing the volume of the cocaine purchased from Campbell supports a finding beyond a reasonable doubt that Kelly "put his head together" with Alford to sell the cocaine for profit. With respect to Kelly's role as a seller of cocaine, Hoots testified that Kelly supplied him nine ounces of cocaine on two different occasions, for a total of eighteen ounces. The evidence, viewed in the light most favorable to the government, supports a finding that Kelly worked with Alford to purchase cocaine in order to sell it for profit as a member of the Alford conspiracy.

### d. Whether there is an established method of payment

The government argues that Alford's statement to Campbell that Kelly was "just used to me just bringin the shit" supports a finding that "Kelly and Alford had done deals in the past in which Kelly would give his money to Alford who would take it and obtain cocaine. Afterwards, Alford [would] bring the cocaine back to Kelly." (ECF No. 901 at 22.) Booker testified that Alford's statement to Campbell meant "there's an established trust between Alford and his customer; that probably they've done this numerous occasions, and there is -- there is a level of trust between the two." (T.T. 4/9/12 at 49-50.) Although Booker's testimony and Alford's statement that Kelly was "just used to [him] just bringin the shit" support a finding that Alford and Kelly performed this type of transaction in the past and had a standardized way to perform the transaction, it does not provide substantial evidence that Alford and Kelly had an established method of payment for the transactions, such as Kelly purchasing cocaine from Alford on credit. Based upon the other evidence presented at trial, however, the government met its burden to

prove beyond a reasonable doubt that Kelly intended to join the Alford conspiracy and shared the conspiracy's goals of selling cocaine for profit.

      **e.   The length of affiliation between the defendant and the conspiracy**

The evidence does not support a finding of exactly how long, i.e., how many days, months, or years, Kelly was affiliated with the Alford conspiracy, but as discussed supra, it supports a finding that Kelly's interactions with Alford and Hoots were not isolated, one-time occurrences evidencing a mere buyer-seller relationship as Kelly suggests.

      **f.   Conclusion**

Viewing the foregoing circumstantial evidence in the light most favorable to the government, supports the "'reasonable and logical inference'" that Kelly's interactions with the members of the Alford conspiracy "'could not have been carried on except as the result of a preconceived scheme or common understanding.'" Gibbs, 190 F.3d at 197 (quoting Kapp, 781 F.2d at 1010.) A reasonable jury could have concluded beyond a reasonable doubt that Kelly knew he was dealing with a larger drug operation when he purchased cocaine from Campbell with Alford, that he shared the Alford conspiracy's goal of selling cocaine and crack cocaine for profit, and that he worked with members of the Alford conspiracy to achieve that goal. The evidence shows that Alford and Kelly worked together so that Alford and Kelly could purchase a large amount of cocaine from Campbell, turn it into crack cocaine, and then sell it for profit. Kelly had the wherewithal to gather at least $104,000 to purchase the cocaine from Campbell and trusted Alford to drive him to the stash house to do so. Kelly intended on selling the cocaine he purchased from Campbell for profit and knew that Alford intended on selling the cocaine he purchased from Campbell for profit, as evidenced by his discussions with Alford about how to increase the cocaine's volume the day after they purchased it. Kelly also sold nine ounces of

cocaine to Hoots on two different occasions throughout 2007-2008, showing that he was involved in the drug business in both a buying and selling capacity. The foregoing circumstantial evidence is sufficient to support the conclusion that Kelly intended to join the Alford conspiracy and shared the conspiracy's goal of distributing cocaine for profit and that his relationship with members of the Alford conspiracy was not a mere buyer-seller relationship. Kelly's motion for judgment of acquittal will be denied.

### C. Johnson

Johnson argues that the evidence presented at trial does not support a reasonable jury finding beyond a reasonable doubt that he was a knowing participant in the Alford conspiracy. (ECF No. 902 at 3) ("[T]he fact that Mr. Hoots was a member of the Alford Conspiracy who sold drugs to Mr. Johnson does not necessarily make Mr. Johnson a member of the Alford Conspiracy.") Johnson's argument is essentially the same as Kelly's third argument, i.e., the evidence presented established nothing more than a buyer-seller relationship between him and the members of the Alford conspiracy. Johnson explains that Hoots never testified that he was a member of the Alford conspiracy and that Hoots "did not know which of his suppliers provided him with drugs which he eventually sold to Mr. Johnson." (Id. at 5.) Johnson maintains that "[d]rugs supplied to Anthony Hoots from sources other than members of the Alford Conspiracy would not render Defendant Johnson a member of the Alford Conspiracy when he bought those non-Alford drugs from Anthony Hoots." (Id.) In response, the government argues it "presented sufficient evidence from which a rational trier of fact could have found that Johnson was a member of a single over-arching conspiracy to distribute cocaine and crack."[13] (ECF No. 904 at 17.)

---

[13] The government argues that "Johnson's argument implicates the multiple conspiracies versus single conspiracy defense," but that Johnson did not identify which of his substantial rights have

The court will consider the evidence presented by the government at trial in light of the Gibbs factors to determine whether a rational trier of fact could have found beyond a reasonable doubt that Johnson knowingly joined the Alford conspiracy to sell cocaine and crack cocaine for profit.

### 1. The extent to which transactions are standardized

The government presented substantial evidence that the drug transactions between Johnson and Hoots occurred often and were standardized in such a way to permit the inference that Johnson knowingly worked with Hoots to achieve the Alford's conspiracy's goal of selling cocaine and crack cocaine for profit. Hoots testified that throughout 2007-2008, he sold four and one-half ounces of cocaine to Johnson on a weekly basis. On more than one occasion, Hoots informed Johnson that he was waiting for his supplier to deliver the drugs for him to sell to Johnson. This informed Johnson that when he was dealing with Hoots, he was dealing with a larger operation, which included Hoots' suppliers. Johnson was also aware that Hoots sold cocaine to other people because when Johnson asked Hoots to sell cocaine to his cousin, Howe, Hoots agreed to so.

Johnson argues, however, that because Hoots "did not know which of his suppliers provided him with drugs which he eventually sold to Mr. Johnson[,]" the government did not present evidence sufficient for a finding that Johnson was a member of the Alford conspiracy. Hoots testified that throughout 2007 and 2008, he purchased cocaine "mainly" from Alford and was purchasing anywhere from one-half to two kilos per week. (T.T. 4/9/12 at 118-19, 129.) Hoots testified that on two occasions during that time period, he purchased nine ounces of

---

been violated as is required to assert the defense. (ECF No. 904 at 6, 22.) Because the court concludes infra that the government presented evidence sufficient for a jury to find Johnson is guilty of the crime charged in the indictment, i.e., being a knowing member of the Alford conspiracy, there is no need to address whether a variance occurred in this case.

cocaine from Kelly. Drawing all inferences in favor of the jury's verdict, the evidence presented at trial supports a finding beyond a reasonable doubt that Johnson, who purchased cocaine once a week from Hoots in 2007-2008, purchased cocaine from Hoots that was supplied by Alford or other members of the Alford conspiracy, such as Kelly. Whether Johnson knew who supplied the cocaine to Hoots is not material to whether the government met its burden in this case, however, because "[t]he government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants." Gibbs, 190 F.3d at 197. "What is needed is 'a general awareness of both the scope and the objective of the enterprise to be regarded as a co-conspirator.'" United States v. Perez, 280 F.3d 318, 344 (3d Cir. 2002) (quoting United States v. Evans, 970 F.2d 663, 670 (10th Cir. 1992)). Here, the evidence supports a finding that Johnson was aware that Hoots was obtaining cocaine from a third party in order to sell it to him and other street level dealers, that Johnson and Hoots shared the Alford conspiracy's goal of selling cocaine and crack cocaine for profit, and that Johnson and Hoots worked together to achieve this goal. Under those circumstances, the evidence presented by the government supports the jury's verdict in this case with respect to Johnson.

Further evidence of Johnson's and Hoots' use of standard procedure and familiarity with each other is their use of vague and conclusory language similar to the language Kelly and Alford used during their conversations. For example, on May 7, 2008, Johnson and Hoots had the following conversation:

AH: Hello.

AJ: What up daddy?

AH: What up?

AJ:  Shit.

AH: Yep. Probably not til Friday.

AJ: Oh Friday ok okay alright. Well I'll just try you back the big cuz.

AH: Alright pimp.

AJ: My man.

(T.T. 4/9/12 at 19; ECF No. 904-2.) In this conversation, Johnson and Hoots did not mention any details with respect to what they were talking about, yet they appeared to understand each other.

On May 9, 2008, Johnson and Hoots again talked in vague and conclusory terms. Their telephone conversation from that day was as follows:

AJ: Are we groovy?

AH: Nope.

AJ: Not yet?

AH: No.

AJ: Aright. Just hit me up then cuz.

AH: Alright. You know I got you.

(T.T. 4/9/12 at 21; ECF No. 904-3.) Again, Johnson and Hoots appear to understand each other without mentioning any details with respect to what they were talking about.

Warfield testified that persons involved in drug trafficking use innocuous terminology and "try to do things to avoid being detected by law enforcement." (T.T. 4/11/12 at 138.) These "unusual and cryptic" telephone conversations support a finding that Johnson and Hoots had an understanding to work together to sell cocaine and crack cocaine for profit because in order to achieve that goal, they had to avoid being detected by law enforcement. See Salehi, 187 Fed. App'x at 167, 171. Their use of vague and conclusory language furthered that goal.

Johnson and Hoots also utilized coded terminology during their telephone conversations, which shows their familiarity with each other and the drug business, and agreement to further the goals of the conspiracy by avoiding being caught by law enforcement. For example, Johnson asked Hoots for a "cidnode" for Howe. (T.T. 4/5/12 at 145; ECF No. 904-1.) Hoots testified that a "cidnode" was Johnson's twist on an "area code" or four-and-one-half ounces of cocaine. (Id.) This evidence shows that Johnson and Hoots not only understood what an "area code" meant, but Hoots understood Johnson's twist on the word as well. In a telephone conversation on May 11, 2008, Johnson asked Hoots if he felt like "fuckin with [Johnson] for a stack…on the code?" (T.T. 4/5/12 at 148; T.T. 4/9/12 at 22; ECF No. 904-4.) Hoots and Booker both testified that this meant Johnson wanted Hoots to give him four and one-half ounces of cocaine for Johnson to pay one thousand dollars for at a later date. (T.T. 4/5/12 at 149; T.T. 4/9/12 at 23.) On May 12, 2008, Hoots told Johnson "I got you in the water right now cuz" meant that Hoots was in the process of cooking powered cocaine into crack for Johnson. (T.T. 4/5/12 at 149; T.T. 4/9/12 at 24; ECF No. 904-5; T.T. 4/5/12 at 150; T.T. 4/9/12 at 25.) The foregoing evidence supports a finding that Johnson and Hoots were very familiar with each other and conducted their drug transactions in a standardized way, i.e., with the use of coded language, to avoid being caught by law enforcement.

Based upon the foregoing circumstantial evidence, a reasonable jury could conclude that Hoots and Johnson's drug transactions were standardized in such a way to permit an inference that Johnson "comprehend[ed] fully the nature of the group with whom he [was] dealing" and worked together with Hoots to accomplish the group's goal of selling cocaine and crack cocaine for profit. Gibbs, 190 F.3d at 199.

## 2. Whether there is a demonstrated level of mutual trust

The government presented substantial evidence that Johnson and Hoots trusted each other. Specifically, the government presented evidence sufficient to permit a reasonable jury to find that Hoots sold cocaine to Johnson on credit. Hoots testified that he gave Johnson cocaine on credit, explaining that "if [Johnson] didn't have all the money, [he] would still give him the four and a half ounces and [Johnson] might have just owed [him for it]." (T.T. 4/9/12 at 139.) The government also played for the jury a telephone conversation between Johnson and Hoots that occurred on May 11, 2008, in which Johnson asked to sell him cocaine on credit, which Hoots agreed to do. (T.T. 4/5/12 at 148; T.T. 4/9/12 at 22; ECF No. 904-4.) This is substantial evidence that Hoots and Johnson trusted each other and had a stake in each other's success. In Gibbs, the court noted:

> A credit relationship may well reflect the kind of trust that is referenced supra, and often evidences the parties' mutual stake in each other's transactions. By extending credit to a buyer, the seller risks the possibility that the buyer will be unable to resell the drugs: even if the buyer does successfully resell the drugs, in this generally thinly capitalized "business," the seller will likely have to wait until the buyer collects the money from his resale before he can pay the seller back for the initial purchase. In addition, the buyer has a vested interest in the seller's ability to maintain a good working relationship with his supplier, since the buyer will not profit unless the drugs continue to flow from the seller's supplier to the seller.

Gibbs, 190 F.3d at 200; see United States v. Caple, 403 Fed. App'x 656, 661 (3d Cir. 2010); United States v. Burgos, 46 Fed. App'x 101 at 103-04 (3d Cir. 2002). Here, Johnson was vested in Hoots' relationship with his suppliers, e.g., Alford and Kelly, because he needed them to sell the cocaine to Hoots who in turn, would sell it to him. Hoots' testimony that he gave cocaine to Johnson on credit also supports a finding that Hoots and Johnson had an established method of payment. See Salehi, 187 Fed. App'x at 172. Based upon this evidence, a reasonable jury could find beyond a reasonable doubt that Johnson shared the goal of the Alford conspiracy

to sell cocaine and crack cocaine for profit and worked together with his co-conspirators to achieve that goal.

Additional evidence of Johnson's trust for Hoots and his stake in Hoots' success is that Johnson was willing to wait for Hoots' suppliers to deliver cocaine to Hoots in order to purchase cocaine from him as opposed to another seller. On May 21, 2008, Hoots told Johnson that "my boat ain't gonna be there till Friday." (T.T. 4/9/12 at 31; EECF No. 904-10.) Johnson responded: "I'll wait on you then fam UI I'll wait on you then fam cause that way I'll probably be having it official." Id. The jury heard testimony from Booker that Johnson saying he would "be having it official" was

> a reference to their established relationship. He's comfortable getting it from Hoots. He thinks it's safer to get it from Hoots, and probably the price will be better because he and Hoots have an established relationship and they've already worked out price.

(T.T. 4/9/12 at 32.) This evidence supports a finding that Johnson was a knowing member of the Alford conspiracy because he "depend[ed] heavily on the conspiracy as the sole source of his drugs, and [was] more likely to perform drug-related acts for conspiracy members in an effort to maintain his connection to them." Gibbs, 190 F.3d at 199.

### 3. Whether the buyer's transactions involved large amounts of drugs

Hoots testified that Johnson purchased four and one-half kilograms of cocaine from him per week throughout 2007-2008. Johnson also knew that Hoots had the ability to obtain more cocaine because Johnson asked Hoots to sell four and one-half ounces of cocaine to Howe. As discussed above, the frequency with which Hoots sold four and one-half ounces of cocaine to Johnson supports a finding that Johnson knew his interactions with Hoots furthered the Alford's conspiracy's goal to sell cocaine and crack cocaine for profit.

**4. The length of affiliation between the defendant and the conspiracy**

As discussed above, Hoots testified that Johnson purchased four and one-half kilograms of cocaine from him per week throughout 2007-2008. Their frequent and standardized interaction that occurred over the course of at least one year, supports the jury's finding that Johnson was a co-conspirator in the Alford conspiracy and that his relationship with Hoots was not a mere buyer-seller relationship.

**5. Conclusion**

The evidence presented by the government at trial shows Johnson's relationship with Hoots was more than an arm's length buyer-seller relationship. Hoots sold four and one-half ounces of cocaine to Johnson every week for at least a one year period of time. Hoots and Johnson's telephone conversations were cryptic and they used coded drug language to communicate to each other. Johnson knew that his dealings with Hoots depended on Hoots' interactions with third parties, i.e., Hoots' suppliers. Hoots testified that he sold cocaine to Johnson on credit and Johnson referred cocaine purchasers to Hoots, proving that Hoots and Johnson had a stake in each other's success. This evidence, viewed in the light most favorable to the government, is sufficient to support the conclusion that Johnson intended to join the Alford conspiracy and shared the conspiracy's goal of distributing cocaine for profit and that his relationship with the Alford conspiracy was not merely a buyer-seller relationship. Johnson's motion for judgment of acquittal will be denied.

**IV. Order**

AND NOW, this 21st day of March, 2013, it is HEREBY ORDERED that for the reasons set forth in this memorandum opinion, the amended motion for judgment of acquittal (ECF No.

894) filed by defendant Kelly and the motion for judgment of acquittal (ECF No. 902) filed by defendant Johnson, shall be DENIED.

By the Court:

Date: March 21, 2013

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge